MEMORANDUM *
I.
Debtor Automotive Distributing for the Farwest (“ADF”) was formed by Peter Osborne in 1994 when he acquired the auto-parts division of Bo-Den, Inc. This transaction was financed by a loan from Bank of America (“B of A”). In October 1994, and in conjunction with obtaining the B of A loan, ADF obtained $1 million in inventory and accounts receivable from Daytona Ignition Products, another company owned by Osborne. ADF needed the funds to convince B of A to lend it money.
One year later, B of A decided to terminate its loan to Osborne and demanded that he pay off the $2.6 million balance. Osborne obtained the funds to pay off the loan from various people including his parents, Tom and Eva Jeffers, and a family *547 friend, Vivian Vicondo. These funds were placed in a trust account and applied to the B of A loan.
A few months later, in early 1996, ADF obtained a $4.5 million line of credit from Deutsche Financial Service Corporation (“DFSC”). Between January 31, 1996 and September 3, 1996, Osborne used this money to pay down the monies borrowed to pay off the B of A loan. These payments went to Osborne’s parents and/or their creditors and totaled $2,710,950.
On January 28, 1997, ADF filed for Chapter 11 bankruptcy, and it was subsequently converted to a Chapter 7 case. Diamond, the bankruptcy trustee, filed this adversary proceeding to void the payments to the Jeffers and their creditors as preferential transfers. Diamond also brought other claims against other defendants.
A bench trial on the preferential transfers was held with the only disputed issue being whether ADF was insolvent during the period of the transfers. The bankruptcy court concluded that ADF was solvent during the period the transfers were made and dismissed the remaining claims against the other defendants. The bankruptcy court specifically adopted, with few adjustments, the figures for ADF’s assets, liabilities, and adjustments to liabilities offered by Anne Renna, the Jeffers’ expert. Based upon those figures, the court concluded that ADF was a going concern, with assets of $12,249,721 and liabilities of $10,218,249 during the critical period. The bankruptcy court identified further downward adjustments to ADF’s assets of $1,300,210. When these liabilities and adjustments were applied against ADF’s assets, there was a resulting excess of $731,262 of assets.
The district court affirmed the bankruptcy court’s finding that ADF was solvent but reversed its summary dismissal of Diamond’s claims against the other defendants.
Diamond appealed. We affirm the bankruptcy court’s factual findings and conclusion that ADF was solvent.
II.
A. Appellate Jurisdiction
Pursuant to 28 U.S.C. § 158(d), this court has “jurisdiction of appeals from all final decisions, judgments, orders, and decrees entered” by a district court on review of a bankruptcy court judgment.
The Jeffers contend this appeal should be dismissed because the district court’s order affirming in part and reversing in part the bankruptcy court’s judgment is not a final one for purposes of section 158(d).
Jurisdiction exists over this appeal because the only issue on appeal is whether ADF was insolvent, and resolving this issue does not require any further factual findings. The order of remand simply reinstated Diamond’s claims against the other defendants that had been summarily dismissed by the bankruptcy court. Moreover, resolution of this issue will aid the bankruptcy court on remand. In re Saxman, 325 F.3d 1168, 1171 (9th Cir.2003) (specifying that courts take a pragmatic approach in evaluating whether an order of remand is nevertheless a final decision). See also North Slope Borough v. Barstow (In re MarkAir, Inc.), 308 F.3d 1057, 1060 (9th Cir.2002).
B. ADF’s Solvency
Determinations of whether an entity is a going concern and whether its assets exceed its liabilities are factual findings, and thus are reviewed for clear error. In re DAK Indus., Inc., 170 F.3d 1197, 1199-1200 (9th Cir.1999).
*548 In reviewing the bankruptcy-court’s conclusion that ADF was solvent during the transfer period, we do not find clear error.
Pursuant to 11 U.S.C. § 547, a bankruptcy trustee may avoid any transfer of a debtor’s property made during the preference period if the trustee can demonstrate that the transfer was: (1) to or for a creditor’s benefit; (2) on account of an existing debt; and (3) while the debtor was insolvent.
Insolvency is a “financial condition such that the sum of [an] entity’s debts is greater than all of such entity’s property, at a fair valuation.” 11 U.S.C. § 101(32)(A). The trustee must demonstrate insolvency by a preponderance of the evidence. In re Kaypro, 218 F.3d 1070, 1076 (9th Cir. 2000). Determining whether an entity is solvent involves a two-part inquiry. First, it must be determined whether the entity was a going concern or on its death bed during the period of the transfers. After determining the proper valuation standard, “the court must value the debtor’s assets, depending on the status determined in the first part of the inquiry, and apply a simple balance sheet test to determine whether the debtor was solvent.” In re DAK Indus., Inc., 170 F.3d at 1199.
The bankruptcy court’s factual findings as to ADF’s financial health during the transfer period support its conclusion that it was a going concern. Those findings included: DSFC’s in-depth investigation of ADF’s finances; that both experts ultimately used a going concern analysis (or at least purported to); that ADF continued to operate for twenty months after the first transfer in January 1996, and for five months after the last transfer on September 3,1996; and that during the transfer period ADF had substantial cash flow and over one hundred employees.
Since ADF was a going concern, it must be valued from the standpoint of the debt- or and as an active entity rather than as an entity on its deathbed. In re DAK Indus., Inc., 170 F.3d at 1200. See also In re Trans World Airlines, Inc., 134 F.3d 188, 196-97 (3d Cir.1998). As a going concern, ADF’s inventory must be evaluated at its “fair market price ... as if [it] had been sold as a unit, in a prudent manner, and within a reasonable time.” In re DAK Indus., Inc., 170 F.3d at 1200 n. 3.
Diamond contends that the bankruptcy court erred in its valuation of ADF’s inventory. However, Diamond fails to present any compelling evidence or authority demonstrating clear error on the part of the bankruptcy court. With regard to his goodwill argument, while it may have been error for the bankruptcy court to consider Osborne’s good relations with vendors, many other facts support the bankruptcy court’s valuation of the inventory. These include the decrease in ADF’s inventory levels between September 1995 and February 1996; the consistent sales of inventory received from Daytona during this period; and that many inventory items did not have shelf lives. As to his remaining argument that the bankruptcy court erred in finding that Ballenger had ascribed the wrong value to ADF’s excess inventory, Diamond fails to explain how the inventory should have been valued or specifically why his expert Bruce Ballenger’s estimates were correct. As the bankruptcy court explained, while Ballenger testified that he used a going concern analysis, he relied on a report which used a liquidation approach. In reviewing the record and the bankruptcy court’s order, we conclude this also does not appear to be clear error.
In reviewing the bankruptcy court’s findings as to the Daytona transac *549 tion, we do not find them to be clearly erroneous. In re DAK Indus., Inc., 170 F.3d at 1199. The bankruptcy court characterized the $1 million of accounts receivable and inventory received from Daytona as equity based upon a number of facts. Those included that Osborne owned Daytona; that since 1996 the contribution was recorded on ADF’s general ledgers and tax returns as equity; that Daytona never made a creditor claim against ADF in its bankruptcy proceeding nor sought to collect the debt from ADF; and that Osborne’s clear intent in the transfer was to contribute to ADF’s equity. The court also accepted Renna’s testimony that the note was recorded on ADF’s ledgers as paid-in capital, i.e. equity, in February of 1996.
Diamond next challenges the bankruptcy court’s exclusion of a $500,000 loan from Vicondo to Osborne. The bankruptcy court found that the Vicondo debt was already recorded on ADF’s books as part of the $2,623,231 shareholder note. The court explained that Osborne sought money from various individuals, including Vi-condo, to pay off the B of A loan. Vicondo received a note from Osborne, which was later replaced by a note from the Jeffers. Osborne placed the money from Vicondo and the others in a trust account and used it to pay off the loan. In exchange, Osborne received a note for $2,623,231. Since Osborne was an owner/eontrolling shareholder of ADF, it was recorded in ADF’s books as a shareholder note. This note was subsequently cancelled, and three notes totaling $2,623,231 were issued to Osborne and the Jeffers. Osborne and then the Jeffers made payments to Vicondo. These arrangements were confirmed by Renna, who reviewed the checks, and by written documentation regarding the money borrowed to pay off the B of A loan, including Vicondo’s loan. In reviewing the record, we conclude this was not clear error.
Finally, Diamond argues that the bankruptcy court erred in excluding the $656,000 Bo-Den debt. Diamond contends this was error because disputed debts must be included in insolvency analysis and this debt was not deemed unenforceable until 1999. In the alternative, Diamond contends that ADF’s assets must be reduced to reflect the true value of the assets acquired in the Bo-Den purchase.
We reject both contentions. The bankruptcy court did not clearly err in excluding the debt. We find persuasive a BAP opinion which held that a court may look to future events to determine how to treat a debt. See In re Sierra Steel, Inc., 96 B.R. 275, 279 n. 6 (B.A.P. 9th Cir.1989) (explaining that “there is no policy reason why bankruptcy judges should not be allowed to consider subsequent events in valuing assets or determining liabilities.”). The bankruptcy court was also correct that an offset was unnecessary since there was no showing of the value of these assets in 1996.
Accordingly, we affirm.
AFFIRMED.

 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3.